Okay, would the attorneys who are going to argue please step forward and spell your last name? Irina Dmitrieva. Oh, should I spell my last name? Yeah, please. D-U-L-L-A-V-I-N-T-H-O-M-A-S-E-R-O-S-E-I-V-E-N-V-I-C-T-E-R-A-P-P-L on behalf of the Chicago Transit Authority. Good afternoon, Your Honors. Oh, yeah. Go ahead. Darrell Schumacher. It's spelled D-A-R-Y-L-S-C-H-U-M-A-C-H-E-R on behalf of the Retirement Plan for CTA Employees. Okay, as usual, I forgot to have the case called. 1825-2, Retirement Plan for CTA Employees v. CTA. Okay, are your names still the same? No, go ahead. Okay, you each get 20 minutes, and the appellant can reserve some time. Do you reserve any time? I would like to reserve about five minutes, Your Honor. Okay. Now, the microphones, just so you know, they don't amplify. They just record. So keep your voices up so all the folks can hear you. Thank you. May it please the Court, Counsel. My name is Darrell Schumacher, and I represent the appellant in this case, the Retirement Plan for CTA Employees. Your Honors, the first issue I'd like to address is the statute of limitations issue. It's our contention that there is a genuine issue of material fact as to when the CTA breached its agreement with the retirement plan. Now, there are three or four fundamental facts that are highly relevant to the statute of limitations issue, the first being the contract itself. This contract at issue in this case is an agreement between the CTA on the one hand, the retirement plan on the other hand, and the CTA agreed to invoice the retirement plan for the actual cost of retiree health care, and that included prescription drug expenses. In exchange, the retirement plan agreed to pay those invoices. That was the agreement. Now, is there, and I'll ask the other side of this, there's no debate about that being, it's not in writing anywhere, is it? It's not in writing other than it was reflected in the executive session minutes of a retirement allowance committee meeting in January of 2003. Other than that, it's not in writing. Yeah, nobody even sent a memo or anything saying, hey, this will just confirm this is the deal? That's correct, Your Honor. Okay. The point about the contract is it didn't contemplate prescription drug rebates. It didn't address prescription drug rebates. It didn't. Well, it didn't happen until a year later anyway, right? With Caremark, that's correct, Your Honor. This agreement was silent as to how prescription drug rebates would be handled between these two parties. The second fact or set of facts that's relevant to the statute of limitations issue is, of course, the dealing between these two parties. These aren't two parties that have dealt with each other on occasion. These are two parties with a lengthy history of dealing with each other, and not just dealing with each other, dealing with each other specific to retiree health care. Two sophisticated parties. Two sophisticated parties, depending on what the issue of sophistication is, but two sophisticated parties, but they dealt with each other for a lengthy period of time. And over that lengthy period of time, a course of dealing was established. And that course of dealing involved a series of credits and debits between these parties accumulating, sometimes for lengthy periods of time, and they would get reconciled at some point down the road. And I think the best example of that course of dealing is the $42 million reconciliation that both parties talked about in their papers. That reconciliation span started in 1995. It was reconciled in 2002. It was paid in several installments over 2002. But it wasn't reconciled for a seven-year period, and that wasn't the only reconciliation and debit and credit accumulation between these two parties. This has been going on for years. So the course of dealing is an important fact with respect to the statute of limitations issue, because, as Your Honors know, one factor that courts can consider when a contract is silent on a particular issue is the course of dealing between the parties. The third fact that's relevant to the statute of limitations issue is the correspondence between the parties, and I would focus on the time period late 2006 and early 2007. I'm specifically referring to an email that was discussed by both sides in November of 2006. The email came from John Kalianas, who was then and is now the executive director of the retirement plan. So let me ask the question. So what does it mean when Kelly Harris says that you, while we're still trying to figure out how the rebates would be credited to the plan? Now, what does the evidence show with regard to that? So that's the critical line there. It is, Your Honor. So why do you believe that helps your case? Well, for two reasons, Your Honor. Number one, I believe you're referring to the February 8, 2007 letter. Yeah, you were just about to talk about that. I was. You're absolutely right. Two reasons. Number one, that letter is some evidence that there was communication between Kalianas and Wall prior to the letter. Number two, it communicates Mr. Kalianas' understanding of how the parties are going to deal with this prescription drug rebate situation in light of the fact that their contract doesn't specifically address it. And Kalianas' understanding, based on his communications with Wall, is that they're going to try and sort this out and that the CTA is going to figure out a way to get the credits, the prescription drug rebates credited to the retirement plan. So why does that begin the running of the statute? You're saying that 2009 is the key date. That's correct, Your Honor. So why, after what you just said, why should 2007 email not be considered the beginning of the time? In my view, Your Honor, it comes down to when this contract was breached. It's our position that in 2007, February of 2007, there was no breach. What happened in February of 2007 is the parties were confronted with a situation that wasn't covered by the express terms of the contract. And they did, consistent with their course of dealing, they did what they've done in the past. They've talked through it. They've tried to sort it out. And Mr. Kalianas clearly was under the impression that there would be some sort of reconciliation down the road. So because there was no breach, because these parties were sorting out how to deal with this contract that was silent on the issue of prescription drug rebates, I don't believe the statute should have started running. There was no breach. Our position is that the breach took place in October of 2009, excuse me, Your Honors, when Mr. Wall sent Mr. Kalianas another letter. It was October 23, 2009. And he, for the first time, conveys the CTA's position, the CTA's interpretation of this contract, which was we don't owe you guys the rebates. But shouldn't, I mean, their argument is you should have started that questioning back in 2007. That's what their argument. I'm not saying, but directly to that response, why should that, why are they wrong? Well, they're wrong because we did start the questioning. This was a situation. But if you knew, if you started the question in 2007, then why shouldn't that be the date rather than 2009? Because you knew in 2007 there was a problem. That's what they're saying. You knew in 2007 there was a problem. And that's when the clock should start. I wouldn't characterize it as a problem in 2007. I would characterize it as the parties confronting a situation that wasn't covered by the contract. Well, why isn't that a problem? Well, because, Mr. Corley, there's some evidence that Mr. Kalianas understood that Mr. Wall was taking out a revised note, was going to try and sort through the situation. He wasn't saying we're not giving these to you in 2007. He was saying, you know, we'll take a look at it. I mean, specifically what Mr. Kalianas said was that Mr. Wall had advised that there were rebates available from Caremark and that you were still trying to figure out how the rebates would be credited to the plan. If anything, I would take that language as an indication that they are going to work this out. There isn't a problem. It's just a situation that hasn't been covered by this contract. And, you know, under the circumstances involving this case where you have these are not parties that were dealing with each other at arm's length. These were interrelated parties. They had a lengthy, lengthy history of dealing with each other. And like I said, they had a history of debits and credits between them that would be reconciled at some point down the future. And that's how Mr. Kalianas interpreted Mr. Wall's conversations back in 2007. And that's how we believe the trial court should have treated the 2007 letter, not as the commencement of the statute of limitations, but as two parties trying to work it out, as they should as a policy matter, rather than running into court and suing or triggering a statute of limitations. But just because they're trying to work it out doesn't mean that a breach has not occurred. Very often there's a breach and you try to work it out and then you file suit before the expiration of statute of limitations. Absolutely agree, Your Honor. However, in this case, it was a situation that they were trying to work out where there wasn't evidence that there was a breach. The contract itself didn't say, you know, CTA had to transmit these rebates within 30 days of their receipt of the rebates. If that were the case. Or that CTA had to ever transfer them at all. At all or more specifically when. Well, I don't know. There's some argument there, but okay. So they were trying to work it out in the context of a contract that didn't contemplate this specific situation. So for those reasons, we don't believe the statute of limitations. Would you say that's a fact question? I would say it is a fact question. I think the fact that the contract didn't cover the situation that the parties found themselves in, in and of itself should be sufficient to generate a fact question as to whether and when these rebates should have been transmitted to the CTA. Let me jump ahead to the court's opinion. The issue we take with the court's conclusions and the court's analysis, the court's opinion granting summary judgment on the issue of statute of limitations never addressed, at least expressly, the issue of breach. The court apparently, I'm assuming implicitly, determined that there was a breach. Each time the CTA received a rebate check and failed to transmit it to the retirement plan. Because the contract is silent, we think that was an erroneous conclusion. We don't think a breach occurred when they received it primarily because the contract didn't address it and in addition because of the course of dealing between these parties. So the fact that the court didn't specifically address breach and apparently implicitly deemed a breach each time the CTA received rebate checks, we think was an error. Well, there was some discussion of it being a breach with each payment. In the court's opinion? Sorry? In the court's opinion. I've got to admit I'm a little bit mixed up if it was in the briefs here or in the trial court. Certainly the CTA has taken the position that there was, I take that back, the trial court ruled that there was an independent breach each time it wasn't transmitted. That's right. That's what I'm saying. Yes. So they did actually address this issue. The trial court. I apologize. I misspoke, Your Honor. Not that it was a breach, but I think that was in the fiduciary duty section of the court's opinion where it talked about that. But I don't think the court specifically addressed it to breach, which is my point. But I am assuming that was the court's conclusion, that the court deemed it a breach each time. Otherwise, I don't think the statute could commence in January of February of 2007 like the court concluded. Right. But then it said something about that it was effective in 2008, June 10th or whatever, which was five years prior to the date of filing of the complaint. That's correct, Your Honor. Yes. The other issue that we take with the court's analysis ruling on summary judgment, and this is out of the court's opinion, and we certainly discussed it in our papers, the trial court initially framed the issue for the commencement of the statute of limitations as twofold. A, the point at which the retirement plan learned of the rebates, and B, the point at which the retirement plan knew or learned that the CTA was not going to credit the rebates to the plan. That's how the court initially framed it in its opinion. And we agree with that framing. We submit that the point that the retirement plan first knew that the CTA was not going to credit the rebates was October of 2009. But the court changed its analysis subtly but significantly, and it changed it from knowledge that the CTA was not going to credit the rebates to the statute commencing when the plan learned that the CTA was not crediting the rebates. Subtle but significant, particularly under the circumstances that we have before us today. So our position is that the retirement plan did not learn that the CTA was not going to credit the rebates to the plan until October of 2009. We believe that's when the breach of contract occurred, and we believe that's when the statute of limitations should have commenced. So what you're saying is that as long as you were under the impression based upon the 2007 email, maybe others, which would come out in evidence, that the statute wouldn't have begun to run until you were made aware that nothing was going to be forthcoming from the CTA. That's correct, Your Honor. That's your argument, which you make very clearly in your brief. That is the argument, Your Honor, and particularly in a case where the contract doesn't address it at all, I think there is a question of fact here as to when this breach occurred. The last point I want to make on statute of limitations is that neither party, neither the CTA nor the retirement plan, argued February of 2007 as the date of the breach. The retirement plan was obviously arguing October of 2009. The CTA wasn't arguing that they breached this contract in February of 2007. That's something I think the trial court made a determination on without either party advocating. But that's nothing wrong with that. Nothing wrong with it. Unless it's wrong. That's what you're saying. Neither party was suggesting that with the case. Unless there are other questions about the statute of limitations issue, I'd very briefly like to touch on voluntary payment. You'll have to. If I'm out of time, Your Honor. Go ahead. I'll be extremely brief on voluntary payment doctrine. It's our position that the court incorrectly applied the voluntary payment doctrine to the facts of our case. I believe if there is a question of fact as to the breach in the statute of limitations, it wouldn't necessarily follow that there would be a question of fact with respect to the voluntary payment doctrine. The one case that the court really hung its hat on, the Wilson case, was factually very different from our case. That was a three-party case. Ours is a two-party case. In Wilson, the recipient of the proceeds relied to its detriment on the receipt of the payments, changed its position. We don't have that here. And quite honestly, you know, the CTA was aware of the retirement plan's position that it was entitled to these rebates, you know, for a lengthy period of time. So for that reason, we think the court erred in its conclusion with respect to the voluntary payment doctrine. Unless there are other questions, I'll save whatever's left. Do you want to say anything? And the fiduciary didn't. You know, Your Honors, given the time, I don't think I have anything constructive to add to our papers. Thank you. Thank you. Good afternoon, Your Honors. May it please the court, Irina Dmitrieva on behalf of the CTA. Your Honors, this case comes to this court after five years of litigation in the circuit court, which included extensive discovery on all of the plaintiff's claims. It also comes to this court after several days, four days of bench trial, during which the court listened to testimony of seven witnesses, observed their demeanor, assessed their credibility. There were more than 30 exhibits admitted into evidence at trial, totaling over 1,000 pages. And at the conclusion of the bench trial, the circuit court judge made a finding that plaintiff failed to prove by clear and convincing evidence the existence of a fiduciary relationship between itself and the CTA. And plaintiff comes to this court with a high burden of demonstrating that the circuit court's judgment was against the manifest weight of the evidence, or in other words, that it was arbitrary, unreasonable, and not based on evidence. This only is the half of it, right? Yes. Because the other half stay null and void on the summary judgment, right? Yes. And even though it is stunning to me that my opposing counsel hasn't spent any time at all on the fiduciary duty claims, which to me means that they're basically giving up that argument. I wouldn't. I wouldn't. I wouldn't. No. I would not. God damn it. He makes the argument. He didn't waive it at all. I just don't. And especially in their briefs, as we point out in our response, they spent very little time stating evidence in support of their arguments, which, you know, they have a high burden to demonstrate the manifest weight of evidence, to satisfy the manifest weight of evidence. But to be honest, what is important to understand about this particular – Can you put that microphone down a little bit so I can thank you? Yes. Thanks, because I can't see you. Thank you for pointing that out. What is important to understand in the circumstances of this particular case, that the plaintiff's contractual breach theory in this particular case mirrors one of the bases on which plaintiff asserts a breach of a fiduciary duty. And this theory is that why was there a breach? One of the theories was that there was a breach of the CTA or the fiduciary duty to the retirement plan because the client credits under the camera contract, the rebates, were an asset of the retirement plan. And why were they an asset? The theory went that because they constituted a discount against the price of the prescription drugs, and there was this agreement between the parties that the CTA will bill the retirement plan for the actual cost of prescription drugs incurred by the retirees. Would they have also billed their administrative costs, the CTA's administrative costs? The CTA actually has never billed its administrative costs. I realize that, but that's because they used the rebate to basically cover those administrative costs. Right. But just stick with me for a second. My point here is that even though the contractual theories were dismissed on summary judgment, as a practical matter, the very same evidence that would have been presented in support of the breach of contract claims was presented at the trial on the merits because it was exactly the same evidence that plaintiffs used to argue to the circuit court that these rebates were an asset of the retirement plan. It's the same theory. It's absolutely the same theory. So as a practical matter, the circuit court ended up hearing the claim that would have been a contractual claim on the merits. So that doesn't persuade me. It wouldn't be the same standard proof on a breach of contract claim, a breach of fiduciary duties. No, but what I'm trying to say is that the evidence was heard by the circuit court. And it's in the record. The circuit court ultimately ruled that there was no fiduciary duties. Actually, the circuit court didn't even get to the issue. It ruled that there was no fiduciary duty. That was the ruling in the circuit court. One of the bases for the ruling was that, based on the totality of evidence concerning the contract, the agreements between the parties, all the witnesses, they did testify about the agreement between the parties. All the statements came out from the witnesses. What did the parties agree in January of 2003? What was the agreement? What was the actual cost? It all came out, and based on this evidence, the circuit court concluded that the client credits, the rebates that the CTA received under the camera contract, were not an asset of the retirement plan, which is basically, it relates to the question, were they the actual costs? The ruling in the circuit court was that there was no fiduciary duty. That is the ruling in the trial court. Yes. The trial court technically didn't get to the issue of whether or not there was a breach of the fiduciary duty, an issue which they would get to if they're not dismissed based on statute of limitations and voluntary payment. The trial court, in fact, your Honor, does say in the trial order that even if there was a fiduciary duty, I find that there was no breach. I believe on page 2 of the trial order, it does say that. Even if the fiduciary duty existed, there was no breach. But in terms of the propriety, let me just step back. The standard for breach of fiduciary duty is not the same as breach of contract. I agree with you, Your Honor. I agree with you, Your Honor. So the trial court's ruling, that means nothing to me. I agree with you. So let me address, since it seems to be, you know, the question of the day, let me step back and talk about the propriety of the summary judgment ruling on the contractual claims. And the way that the circuit court addressed it is by applying the voluntary payment doctrine in the statute of limitations. And it was just a straightforward application of the inquiry notice concept because both the voluntary payment doctrine and the discovery rule under the statute of limitations, they are both triggered by the inquiry notice. So with respect to the voluntary payment doctrine, Harris v. Church 1, voluntary payment doctrine applies as soon as this plaintiff has enough information to determine whether there was a basis to protest or at least to investigate the exact factual basis for the charges. So why would they have had a basis when in 2007 they're told that, you know, we're going to look into this, that they may be entitled to, the plan might be entitled to some rebate? In February of 2007, what the letter reflects is that the retirement plan, because Kayanis was an executive director and agent, so retirement plan was on notice of two facts. First, the CTA was receiving for years rebates under its pharmacy benefit management contract. With Claremont at this point, it was receiving rebates under the pharmacy benefit management contract. In fact, too, it was not sharing any portion of those rebates with the retirement plan. But he said that you were still trying to figure out how the rebates would be credited to the plan, would be credited, would be credited. So you're telling them, don't look at anything. You know, we understand. We're looking into this. You're trying to give them a signal. Well, that particular issue actually was, that particular issue will testify that he never would have said that the rebates would have been credited because he didn't have authority to make that decision. But in any event, it doesn't have to be actual notice. It does not have to be actual notice that the CTA would never credit the retirement plan with the rebates. What Plaintiff effectively argues here is that we should have been on actual notice that this is it. The CTA considered an issue, and they're not going to credit the rebates. They're at that point, they're arguing, that's when the limitations period started running. But that's not the law. All the law requires is that Plaintiff has enough information to determine what was the basis, or at least to investigate the exact factual basis for the charges. And what's interesting here, that even after this initial correspondence exchange, Mr. Kalyanis has never requested a copy of the KMAC contract from the CTA. So they're engaging in correspondence. Well, how are they relevant? Because it's his duty, it would be his duty as a fiduciary to his own retirement plan. He has a business... Well, he knows there's rebates, right? He knows. And he's been told that they're going to, and they know, the retirement plan knows that they may be credited, would be credited for the rebate, would be credited. And so, and you know also what's interesting, that happens in 2007. Right. In 2003, according to the Plaintiff's version, the parties agree that CTA would begin to send the fund bills for the actual costs incurred by the retirees and their dependents, eliminating the need for reconciliation in the future. So the entire basis of the agreement was we want to avoid the reconciliation in the future. And right now, and it's four years later, they're saying it was reasonable for us to believe that it would take many years and in the end we would reconcile because that was the course of dealings between the parties. No. Whatever the course of dealings between the parties was, as far as reconciliation goes, it ended in January of 2003. And we have it in writing in nine minutes, eliminating the need for reconciliation. Yeah, but at that point there was no rebates, right? There were rebates under the Walgreens contract, which is also evidence. You know, because of extensive discovery, the discovery was conducted on all the claims, including contractual claims, and the Walgreens contract is, it was... The contract was different though. Under the Walgreens contract, they were nowhere to determine what the rebates would have been because they didn't distinguish them. Well, that is not exactly accurate. That is exactly correct. What was referred is to the request by the retirement plan after the fact to allocate a portion of the rebates to the retirees. And the CTA followed up on this request and it sent out inquiries to Walgreens to try to apportion those rebates. And Walgreens said, we never apportioned rebates to individual purchases to retirees, so we cannot do it. That's exactly what I just said. You said that's not correct. But that doesn't mean that. That doesn't mean that the contract was drafted differently. It just means that the Walgreens didn't venture to estimate the portion. It was a different situation. It was a different response for all the potential business effects because that is not in the record how Kmart ever estimated that portion of the rebates that's allegedly attributed to retirees. They just went through a very simplistic approach. They said, well, retirees account for approximately 69% of the prescription drug purchases. Therefore, we can attribute 69% of rebates to them. Walgreens just didn't make that leap. Walgreens just didn't make that leap. But it doesn't mean that the rebates functioned differently under both contracts. Are you saying that the Walgreens agreement is relevant to our decision? I believe it refutes Prince's contention here that the issue of rebates came up a year after the alleged agreement in January 2003. But isn't it different than this CVS? I mean, I'm just trying to figure out why that's relevant. Because we're talking about CVS. Well, it was relevant to the plaintiff's original complaint because the complaint obviously was filed for a reach-off contract under both contracts. All right, but we're not talking about Walgreens. We're talking about Karmark with the CVS. But I do take an issue with Prince's representation that in January of 2003, no one even thought about rebates. They were not on anybody's mind because the issue came up early under the Karmark contract. That is not true. First of all, there is testimony in the trial that it's an industry-known and early pharmacy benefit management contract. And as a fact, CTA did have a pharmacy benefit management contract with Walgreens before the January 2003 agreement. So the representation that somehow it was an absolutely novel issue that no one ever had in mind, that is incorrect. That is contradicted by the record. But otherwise, no, Walgreens' contract is not relevant to this discussion. Let me back up for a second. If I heard you right, you said Mr. Wall took exception with Mr. Mr. Kalyanis testified in his deposition. Actually, he does not remember the exact conversation with Mr. Wall. And Mr. Wall said I would have never presented to Mr. Kalyanis that CTA would credit those rebates because I did not have authority. But doesn't that go to credibility and doesn't that go to become a fact question? No. Is it appropriate for some reason? It does not become a fact question because it doesn't refute the fact that they were on inquiry notice but potentially they might have a legal claim. It doesn't require actual knowledge that CTA wronged us. It requires an inquiry knowledge to investigate whether in fact we have a legal right to claim those rebates. And they absolutely were on inquiry notice. And what do they do after that letter? They pay, they continue paying full invoices without any protest for the next two years. They stop after two years because the health care trust is created by the legislature. Health care trust assumes the responsibility of providing for health care for CTA retirees. And then they wait additional four years to bring the claim. And so it's unclear why so long. Six years they're sitting on their rights, alleged rights. They're sitting on their alleged rights. And the entire policy purpose behind the doctrines of voluntary payment doctrine, is that the parties, if they believe they might have some legal rights, they bring it to the attention of the other party and assert their rights at the first possible opportunity. We don't want to encourage people to sit on their rights. Because if CTA, if the retirement plan filed the result sooner, CTA would have been in a different position. Because as far as CTA is concerned, it was very clear. The cause of dealings between the parties was the retirement plan was never entitled to those rebates. It was a complete surprise for the CTA to even know that, you know, this is how their retirement plan feels. Because the CTA fronted quarter billion dollar pharmacy management contract with Caremark, with the sole responsible party for payments under this contract, covering all administrative costs for all of the beneficiaries, including retirees. And the way it was made possible is by virtue of those rebates, client credits, which benefited everybody, including the retirees. Right. And that makes sense. But that was never negotiated or discussed between the parties. And I appreciate what you're saying, because it does make sense. But it wasn't, right? It wasn't negotiated or discussed, the fact that they needed the rebates. Otherwise, they would be charging for administrative costs. Well, in the case where, you know, under federal agency, it's very clear that when the employer creates the terms of its welfare benefit plans, it's not performing a fiduciary function, right? An employer could be acting in an employer's own interest. It could enter into business arrangements that make possible, that make possible the creation of this prescription drug plan for everybody. And so CTA, of course, negotiated the terms of this contract between itself and KAMARC as private parties. It went into business arrangement, which included those client credits that lowered the cost to the CTA of administering this contract. And that was the reason why it was possible for the CTA in the first place to even enter that contract with the CTA, because the number that the Chicago Transit Board looked at when it approved the contract was 226 million, which was 11 million less than it otherwise would have been if CTA didn't negotiate those client credits. And everybody benefited from that contract. It provided the lowest prescription drug costs for all 37,000 participants, including the retirees. And, again, this is, you know, we said case after case on the voluntary payment doctrine and the discovery rule under the statute of limitations that requires just the inquiry notice. No actual notice is required. It's when, you know, the case involving a person whom relatives gave money, understanding that he would include their names in the legal title for the properties, and he's never done it, and the court is saying, well, but it was public records. You could have checked whether he's done it or not. And so it's a public record. You want an inquiry, you know, you want an official inquiry notice. That's when this limitation period started running. And it's not years later in some illegal proceeding when the person actually came out and said, no, I never amended the legal title. It was always in my sole name. And that's exactly the situation that the plaintiff is arguing here. Kerner contract was a public document. Transit, Chicago Transit Board approved it in a publicly held meeting. It issued the ordinance approving the contract. The number of the contract was, you know, in that ordinance. It was a public record. The plaintiff never issued an argument at the city in the trial court. It also could have been forwarded. And it could have been a... But all of it still doesn't go to the question before us here. Because just because all that is public, the contract did not deal with this issue. So that's their claim. The alleged contract. But what's... There's no written contract that deals with this claim. Right? The unwritten... That's why it's a five-year statute. Could you please explain what deals with what claim? The claims that are brought by the attorneys... The claim that they rebate... The contract. It's a contract claim. They're breaching contract claims. A five-year claim. Because it's not a written contract. And the contract claim is that somehow rebates should have reduced the actual cost. There is no basis in their record for the plaintiffs to make this argument, even after extensive discovery on summary judgment. Because if we look at the contract... If we look at the contract... Supplement E-913. Exhibit C, financial terms. The rebates on the client claims, they never reduced the prescription drug costs for the CTA. And the CTA is liability under the contract. And the client payments provision states, for each prescription dispensed by a care mark, client, which is CTA, shall pay a care mark the amount listed below, less the participant co-payment. It doesn't mention rebates. There is no basis in the contract at all to claim that rebate was supposed to lower the actual cost of the prescription drug, if we are talking about the merits. Again, the way the GMR contract was set up... The merits are not the issue before us. The issue before us is the statute of limitations and the voluntary payment doctrine. If this Court were to find that there are material issues of fact as to the statute of limitations issue, where... And don't argue that. I'm just suggesting. If we were to find there is an issue, where does that leave us on the issue of breach of contract? If you were to find that there is a material issue of fact, could you please specify what would be the issue of fact? I asked you not to argue that. No, I'm... I asked you, I don't want to argue it. I don't want to go back and forth because I don't know how the Court is going to find it. There's no rulings made at this point. It's hard for me to answer you on the... Well, where does that leave us? Well, I think it leaves us with the issue of voluntary payment doctrine. And whether or not the appellate court could affirm the trial court on the issue of the voluntary payment doctrine. That's where we leave us, correct? Yes, and as a matter of fact, in its order of summary judgment, the trial court, it accepted as true the plaintiff's representation that there was a contract. You know, that there was a contract. It accepted as true the plaintiff's representation and said, even if there was a contract, just like the plaintiff alleges, even if there was a contract, you still cannot recover on it under the voluntary payment doctrine. I'm going to ask counsel the same question. I already know that he disagrees with you, but I want to hear his argument on the issue. But also, your Honor, as a practical matter, just as a litigation, just speaking as litigators, if this matter somehow ends up remanded to trial, it will be exactly the same evidence that was already, it was very impractical because it would be exactly the same evidence that was already presented to the trial court because, again, the plaintiff's contractual theory mirrors one of the basis for the breach of fiduciary duty. It would be exactly the same, exactly the same evidence. And as far as the standard of review is concerned, now, if the fiduciary relationship, if the plaintiff argues some special circumstances forming the fiduciary relationship, then the standard of review is clear and convincing evidence. But the theory that I'm talking about, the asset that somehow rebates for the asset of the plan, and that mirrors the contractual theory, that I do not believe is a clear and convincing evidence.  So in a sense, it would be precisely the same standard. It would be, the court would be listening to the very same witnesses, looking at the very same documents that are already in the record, and applying the very same standard preponderance of evidence the plaintiff argued, arguing that rebates are an asset of the plan. The court has already done it. The court has already addressed and said, no, looking at the contract, listening to witnesses who actually read the contract, applied this provision, we do not believe that the rebates are an asset of the plan. They were a marketing incentive to the CTA to enter into this contract, to make it possible for everybody to enjoy those lowest cost prescription drug benefits, and it reduced the bottom line for the CTA. What is also, I think we're pretty much out of time. Okay. I apologize to the audience. I thought that they were carried away. Is that all? So we will ask that the judgment of the circuit court be affirmed. Thank you, Your Honors. Thanks. Your Honors, I'll be brief, and I'll start by answering Justice Walker's question, and I believe I understood the question to be, if you reversed on the statute of limitations issue, where does that leave us? Two places, really, Your Honor. Number one, I believe a trial on the breach of contract claim, at least up to the point that the court applied the voluntary payment doctrine, would be required. Because, recall, the voluntary payment doctrine kicks in at a certain point in time. I believe the trial court applied the voluntary payment doctrine after February 7, 2007, February 8, 2007. So the first place it would leave us is with a trial on the merits of the contract and the unjust enrichment claim. Second place it would leave, Your Honors, is resolution of the voluntary payment doctrine issue, which I addressed previously, but we think that was also an erroneous conclusion, particularly if Your Honors determined that the statute of limitations issue was wrongfully decided by the trial court. Hopefully that answers your question satisfactorily. And I just want to make a couple of other points. Counsel made some arguments about the court's finding that these prescription drug rebates were a general contract incentive. It wasn't a discount against the price of drugs. I think where she was going with that was building toward a point that that somehow precludes our contract claim or unjust enrichment claim, and I would suggest to Your Honors that it does not. Whatever label is placed on these prescription drug rebates, whether you call them a discount against the price of drugs, whether you call them a general contract incentive, the reality is they reduced the CTA's actual cost for prescription drugs. And we know there's at least some evidence of that in the record. Number one, CTA admitted at trial that for an accounting purpose, it booked the prescription drug rebates in the same general ledger account that it booked prescription drug expenses. So we know it at least placed them there for accounting purposes. We also know that Caremark described the prescription drug rebates in the context of the federal anti-kickback statute, and this is right in the Caremark agreement, as a discount against the price of drugs. So I don't think the Court's finding that it was a general contract incentive is dispositive of our contract claim or our unjust enrichment claim. And there seems to be an implication, though, that the rebates did not cover CTA's administrative costs and that that's basically how the rebates were used, which is why they don't believe that they owe any money, and that's why they don't believe there was any kind of relationship, because they were negotiating on their own behalf to cut their administrative costs. I understood, Your Honor, and I would take it back to the contract between the CTA and the retirement plan, which was we will bill you for the actual cost of prescription drugs. There was no discussion about we're going to keep the rebates in lieu of charging you an administrative fee. That was never a topic of discussion. It was never negotiated. In fact, the first time that came up was in October of 2009 when Mr. Wall emailed Mr. Callionis. We talked about that letter earlier. That's the first time that was explained to the retirement plan. But regardless of the motivations, the contract was the contract. These, we believe, should have been included as part of the actual cost, but the issue before Your Honors is statute of limitations. I disagree with counsel's contention that the evidence would have been exactly the same if our contract claims had survived. The contract was no longer relevant. This was a breach of fiduciary duty case when it went to trial. And as Your Honor pointed out, they are different standards. So for all those reasons, unless Your Honors have further questions for me, I respectfully request that Your Honors reverse the trial court's holdings as set forth in our brief. Thank you. Great. Thanks very much. Good job. Appreciate all your work. And you'll be hearing from us. Thank you.